# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIELA BARAJAS, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br>　　vs.<br><br>BLACK ENTERPRISE, a New York corporation; and DOES 1 through 25, inclusive,<br><br>　　　　　Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)** |

## INTRODUCTION

1.　　Defendant BLACK ENTERPRISE ("Defendant"  or "Black Enterprise") uses data broker software on its website – https://www.blackenterprise.com/ (the "Website") – to secretly collect data about a Website visitor's computer, location, and browsing habits.  The data broker software then compiles this data and correlates that data with extensive external records it already has about most Californians in order to learn the identity of the Website user.

2.　　Defendant's installation and use of data broker software without obtaining consent is a violation of the California Trap and Trace Law, California Penal Code sections 638.50 and 638.51.

## JURISDICTION AND VENUE

3.　　This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class.  Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

1

4.    This Court has general jurisdiction over Defendant Black Enterprise because it is a New York corporation with its headquarters located in New York, New York.

5.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendant resides in the District, where its headquarters are located.

## PARTIES

6.    Plaintiff Mariela Barajas ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California. Plaintiff maintains reasonable expectations of privacy when browsing websites. Defendant systematically violated these expectations through its unauthorized surveillance activities.

7.    Defendant Black Enterprise owns and operates https://www.blackenterprise.com/ (the "Website").  The Website offers the public content concerning business, investing, finance, careers, technology, entrepreneurship and leisure.

8.    Plaintiff identifies DOE Defendants 1 through 15 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

9.    Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

10.    Defendant is the proprietor of the Website.

11.    The Website, like most other websites, due to code or software programs running on the Website, can determine the approximate geolocation of its visitors once the visitors request to visit the Website from their devices.  This ability exists separate and apart from the Data Broker software running on the Website that forms the basis of the claim asserted in this action.

12.    Defendant has partnered with registered California Data Brokers in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors (the "Data Brokers," and each a "Data Broker").  Defendant has done this by installing at least one Data Broker Software Development Kit on the Website.

13.    DBSDKs are designed to track and correlate visitors by capturing electronic impulses designed to identify them. This is accomplished through "browser fingerprinting," a process by which Data Brokers are able to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.

**Registered California Data Brokers**

14.    Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations.  Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

15.    Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

16.    Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual.  The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

17.    Data Brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual:  "We know who she is, what she watches, what she reads, and who she lives with.  [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys.  We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[1]

18.    Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of their website visitors in order to harass them with unwanted solicitations.

19.    Defendant has in fact partnered with the Data Brokers mentioned herein, by installing software on the Website in order to deanonymize, identify and target prospective customers, while allowing Data Brokers to access, use, and monetize the data provided by Defendant, in manners that are never shared with anyone outside of their organization who does not purchase it.

---

[1] Lucas Ropek, Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users, March 15 2025 (Gizmodo.com).

**Defendant and the California Data Brokers**

20.    Defendant's installation and use of DBSDKs violates the California Trap and Trace law.

21.    Specifically, Defendant has installed the DBSDKs of LiveRamp, Inc. (the "LiveRamp DBSDK"), Outbrain Inc. (the "Outbrain DBSDK"), Comscore, Inc. (the "Comscore DBSDK"), Quantcast Corporation (the "Quantcast DBSDK"), MediaMath (the "MediaMath DBSDK"), Nielsen (the "Nielsen DBSDK") and PubMatic, Inc. (the "PubMatic DBSDK") on its Website.

22.    LiveRamp is one of the largest data brokers in California, specializing in deanonymization of website users. The LiveRamp DBSDK tracks online signals from a website visit and matches it with their vast database to create a universal serial number for a person called a "RampID." The LiveRamp DBSDK functions as follows:

23.    First, when the LiveRamp DBSDK loads on a webpage, it immediately captures the user's identifiers present in that context – e.g. reading any first-party cookie ID or a platform's ID that the page passes, as well as standard header info like IP and user-agent.

24.    Second, the data obtained by the LiveRamp DBSDK is sent to LiveRamp's servers where LiveRamp combines the data obtained from a visit to Defendant's website with other data it has obtained about the individual both online and offline.   This data includes name and postal address, email address, cookie IDs, and mobile device IDs.

25.    Third, through this process, the user is matched with their pre-existing "RampID" (data broker serial number).  LiveRamp's RampID is permanent, and designed to persistently track an individual across thousands of websites. RampIDs do not change with clearing cookies or switching devices.  The RampID, and the data associated with it, is widely shared with dozens of

ad tech partners so that all parties who pay for it can identify the user, and see the user's online habits.

26.     Identification of website visitors through the LiveRamp DBSDK happens in "real-time," allowing the websites of LiveRamp's customers to "access people-based data immediately at the time of impression."  It also works across devices: In other words, the LiveRamp DBSDK can inform websites using it that the same account or person has accessed the website from different devices. As LiveRamp explains, "[w]ith impressions matched to a persistent people-based ID, data are stitched across devices and not lost over time with new cookies or phones."

27.     Outbrain is a content recommendation platform, advertising network and personalization engine for content. The Outbrain DBSDK functions as follows:

28.     First, when a page loads, the Outbrain DBSDK captures the user's IP address and translates that IP into a general geolocation (city/region). It also notes the device type, browser type, operating system, and referring URLs. All of this happens via the web requests the browser makes to Outbrain's domain to fetch content or ping for tracking.

29.     Second, the Outbrain DBSDK will drop a cookie on the user's browser (if not already present) to assign a Unique User ID (UUID). This UUID is an identifier that Outbrain uses to keep track of that user on any Outbrain-enabled site. Outbrain's systems catalogue and analyze the content the user consumes across partner sites associated with that UUID.

30.     Third, the Outbrain DBSDK logs information about the user's interaction with the page and stores it in order to accumulate a browsing profile about a user without their consent.

31.     Comscore, Inc. ("Comscore") is a data broker that monitors individual users across sites via unique IDs and captures their real-time browsing metadata (IP, pages, timestamps) for analysis.

32.     The Comscore DBSDK functions as follows: First, when a user visits a tagged site, the Comscore DBSDK triggers an HTTP request to Comscore's servers. This request transmits identifying signals in real time – including the user's IP address, a timestamp, and browser type.

33.     Second, the Comscore DBSDK sets a unique cookie in the user's browser upon first contact, which enables recognizing that browser on subsequent sites. This allows Comscore to "observe 'browser-level' behavior, i.e. how often you return to a website or if, having visited one website, you go to another related one."

34.     Third, the Comscore DBSDK intercepts the user's web request and logs it to a third-party server along with persistent identifiers. The data collected (page URLs, titles, visit times, IP, etc.) is used to build user profiles and deduplicate audiences across different websites.  In other words, gathered data is correlated with demographic or personal information in Comscore's panel, which Comscore can then sell.

35.     The Comscore DBSDK thus facilitates continuous, cross-site tracking of users via a unique ID tied to their device.

36.     The Quantcast DBSDK collects such information as browser type, user agent, unique cookie ID, referrer URL, search terms (from referrer), page URL and timestamps that can be used to match a visitor to other visits to the Website or to other websites that use the Quantcast DBSDK.  It uses such captured data to infer a visitor's frequency (in terms of visits), interests and demographics. The Quantcast DBSDK also sets a persistent third-party cookie ("historically __qca") to assign a unique ID for a visit to the Website.

37.     The Quantcast DBSDK facilitates invasive ongoing tracking of website visitors. The tracking occurs across a vast network of websites using the persistent cookie ID it sets for a visit/visitor to the Website.  This DBSDK uses the data it has collected for its own advertising

platform and, on information and belief, in some instances provides insights and information about visitors to websites with third-party advertisers.

38.     As a registered data broker in California, MediaMath's business revolves around collecting and leveraging user data for targeted marketing. It partners with numerous advertisers and publishers, embedding its tracking code (the "MediaMath DBSDK") on websites to gather information about visitors.

39.     The MediaMath DBSDK "identifies you by means of personal data related to your computer or device using cookies and other similar technologies."  Specifically, the MediaMath DBSDK collects "the time you visited the site, the page URL, your IP address, your browser type, the operating system, the type of device… and data regarding your activities on the site. MediaMath then assigns your browsers and devices a 'unique identifier called a 'MediaMath ID'" to help track a website visitor in the future.

40.     This in turn allows MediaMath to build a profile about consumers browsing the internet.  The  purpose of such profile-creation is to enable MediaMath, its partners, and its customers, to ingest external data about a website user and match it to that user's profile via the MediaMath ID.

41.     In this regard, MediaMath confirms that it engages in "Cookie Syncing" with third-party partners, where it matches a user's MediaMath ID with identifiers used by other companies. In other words, MediaMath shares and receives unique identifiers to expand the tracking net, connecting what it captures through its own pixels with data from across the ad tech industry.

42.     Nielsen operates an extensive digital tracking regime through its Nielsen Marketing Cloud and Digital Ad Ratings services.  Nielsen's tracking employs various pixels and SDKs across devices. For web and mobile, Nielsen tags (often called Nielsen DAR tags or Nielsen pixels)

are placed in ads and on sites to beacon back user info for measurement. These tags intercept key identifying signals in real time – on desktop they capture the user's IP address, Nielsen cookie ID, browser type and settings, device characteristics, and even hashed email if available.

43.    All this data is transmitted to Nielsen's servers moment-by-moment as content or ads are consumed. Critically, Nielsen combines these data points to perform "deduplicated" tracking across platforms – linking the same person's phone, desktop, and TV viewership. For example, Nielsen's systems will recognize if the IP address and a hashed email from a streaming app correspond to the same user who appeared via a cookie on a website, thereby unifying those records under one Nielsen ID. Nielsen openly acknowledges collecting hashed email addresses and other identifiers to facilitate this cross-device matching.

44.    Once intercepted, the data is fed into Nielsen's identity graph and panels to assign demographics (age, gender, etc.) or outcomes (conversions) to that user. Essentially, Nielsen's pixel and SDK network function as an omnipresent sensor array: whether a user is watching a Smart TV app, browsing on mobile, or reading news on a laptop, Nielsen tags are there to silently capture that "envelope" information (who/when/where) and phone it home to Nielsen for aggregation and sale to anyone who wants to buy it.

45.    PubMatic helps online publishers (websites, mobile apps, etc.) manage and sell their ad space to advertisers in real time auctions. To do this, PubMatic runs code on publisher websites (such as Defendant's) and in ad slots that can track users and synchronize advertising identifiers.  Sitting between publishers and advertisers, PubMatic collects data from the publisher side (users visiting publisher sites) and makes that data available to advertisers to inform bidding and targeting decisions.  PubMatic's platform involves setting cookies and using other tracking methods to recognize users across the websites in its network.  It then enriches that data by syncing

it with the data collected by other ad tech vendors, creating a broad picture of a user's browsing for advertising purposes. PubMatic's revenue depends on identifying users and auctioning their attention to advertisers; thus, it has a strong motive to gather as much signaling information about each user as possible.

46.     PubMatic's technology stack includes cookies, web beacons/pixel tags, and JavaScript code that run on publisher pages. When a user visits a site that uses PubMatic to serve ads, the following typically happens: the site's ad slots will make a request to PubMatic's servers (or a header bidding wrapper will call PubMatic) to fetch ads. In that moment, PubMatic will attempt to identify the user through use of a cookie. For example, PubMatic sets a cookie called a KADUSERCOOKIE on a user's browser; PubMatic's own literature states: "We use this cookie to uniquely identify each browser or device from which an individual user visits our partners' websites." If the KADUSERCOOKIE isn't present, PubMatic will set another one, tagging the user's browser with a unique ID value.

47.     Alongside cookies, PubMatic may use pixel tags or web beacons. These are small pieces of code or 1x1 transparent images that load from PubMatic's domain, enabling PubMatic to collect info including how a user interacts with a website or advertisement. For example, an ad served via PubMatic to a user visiting a publisher website might include a tracking pixel that notifies PubMatic if the user hovered over or clicked on the ad. According to PubMatic's documentation, the PubMatic DBSDK automatically gathers unique online identifiers (cookie IDs, device IDs), IP addresses, browser type, device type and web browsing history related to ads. It also tracks how individuals engage with ads and websites.

48.    Over time, as the user visits more sites with PubMatic operating, PubMatic builds a log of that user's ad viewing history and site visits (to the extent those sites use PubMatic). The result is a comprehensive user profile keyed to a unique ID.

49.    Visitors to the Website do not meaningfully consent to the above-described identification. The tracking described herein is third-party and occurs by default. Visitors to Defendant's Website are not made aware of, and are not able to disable, this tracking and identification.

**Plaintiff Was Subjected to Trap and Trace Devices on the Website**

50.    Plaintiff visited the Website on February 23, 2025. When Plaintiff did so, their identifying information was sent to Data Brokers including LiveRamp, Outbrain, Comscore, Quantcast Corporation ("Quantcast"), MediaMath, Nielsen and PubMatic by way of electronic impulses.

51.    The purpose of this transfer of data from Defendant to the Data Brokers was for de-anonymization, profiling, targeting and ongoing browsing tracking (as described *supra*). The transfer benefitted Defendant and the Data Brokers financially.

52.    On information and belief, the Data Brokers took Plaintiff's information and added the information to its profiles of Plaintiff and of members of the putative class. In turn, Defendant received other relevant data obtained by the Data Brokers regarding Plaintiff. Further, the Data Brokers can use the information regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies.

53.    The seven DBSDKs operating on the Website caused harm or an imminent, material risk of harm to the interest of Plaintiff and members of the putative class in controlling

their own personal information. The type of tracking initiated by the DBSDKs on the Website, which involves the amassing of large amounts of data about a user, interferes with the seclusion of individuals, and deprives them of any meaningful opportunity to prevent or control the unauthorized exploitation of their private lives by the Data Brokers.

54.    In this regard, a recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[2] There are recent examples of tech companies exchanging information with the federal government in ways that threaten harm to women's freedom, minority viewpoints and marginalized United States citizens or residents. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[3]    Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[4]

55.    The prospect of private entities such as Data Brokers sharing data they have collected and organized into individualized profiles with government entities has increased significantly in 2025.  Columbia and Brown Universities recently agreed to turn over data about applicants and students, such as their race, grades and standardized test scores to the federal

---

[2] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole
[3] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/.
[4] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185.

government.[5]  During this year, tech companies have complied with unprecedented demands for concessions from the federal executive branch.[6]  Further, the current federal administration has threatened retaliatory action against pharmaceutical companies that refuse to comply with demands to lower drug prices.[7]  No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

56.    The only purpose of the LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic DBSDKs is to identify users and then track them on the internet.

57.    The LiveRamp DBSDK "uses identifiers (such as name and postal address, email address, RampIDs, cookie IDs or mobile device IDs) to match [ ] records [concerning visitors to a customer's website] to other identifiers in our Identity Graph."  According to LiveRamp, "[a]n identity graph is a data structure that maps relationships between various identifiers [of persons or accounts] and links them."  The Outbrain DBSDK captures a user's IP address, which it translates into geolocation data, as well as the user's device and browser type, and operating system.

58.    The Comscore DBSDK is a process to identify the source of electronic communication by capturing electronic impulses sent out from Website users' devices and identifying dialing, routing, addressing, and signaling information about or generated by the users. The users are never informed that the Website is collaborating with Comscore to obtain their phone numbers and other identifying information. The Comscore DBSDK is "reasonably likely" to

---

[5] *See, e.g.,* Sharon Otterman & Anemona Hartocollis, "Columbia and Brown to Disclose Admissions and Race Data in Trump Deal," (New York Times Aug. 6, 2025), found at https://www.nytimes.com/2025/08/05/nyregion/columbia-brown-admissions-trump.html.
[6] *See, e.g.,* Rob Wile & Allan Smith, "The CEO in chief: How Trump is getting what he wants from big business," (NBCNews.com Aug. 14, 2025), found at https://www.nbcnews.com/business/business-news/what-trump-involvement-major-corporations-means-us-politics-business-rcna224630.
[7] *See, e.g.,* Anna Bratulic, "In latest Trump salvo, pharma giants face 60-day ultimatum on price cuts," (First Word Pharma, July 31, 2025), found at https://firstwordpharma.com/story/5985417.

identify the source of electronic impulses sent from devices visiting the Website.  In fact, the Comscore DBSDK is designed solely to meet this objective.

59.    The Quantcast DBSDK is aimed at developing a demographic assessment of a website's audience, and to identify its interests. It captures such information as user agent and IP address that can help identify a user across websites and platforms using the Quantcast DBSDK. MediaMath collects data from visitors to advertisers' websites and allows advertisers to match that data with both identifying offline data and data collected by other enterprises in the advertising space.

60.    The Nielsen SDK identifies users by primarily collecting device-level data and linking it with demographic information from Nielsen's proprietary panels, "big data" partners, and direct integrations using a multi-faceted ID resolution system.  The PubMatic SDK works in essentially the same manner.

61.    These seven DBSDKs meet the definition of a "trap and trace device" under Cal. Penal Code § 638.50(c) because the LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic processes capture signaling information (who the visitor is, and what they are doing) in order to identify the source of an otherwise anonymous website visit – which such visit constitutes an electronic communication.

62.    There is no way for Plaintiff to learn what the Data Brokers did with Plaintiff's data, including what inferences the Data Brokers have gleaned from it, or when, why and to whom the Data Brokers have sold or licensed Plaintiff's data.  As such, Plaintiff has been injured by Defendant's surveillance practices.

63.    Plaintiff was never informed of, and therefore could not have consented to, data collection by the Data Brokers for mercantile purposes.  Plaintiff has no way to know the scope of

the injury suffered because the Data Brokers operate in secret and without public disclosure of their operations.

**The LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic**

**DBSDKs**

**Are Trap and Trace Devices.**

64.    CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

65.    Each of the LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic DBSDKs is a process to identify the source of electronic communication by capturing electronic impulses sent out from Website users' devices and identifying dialing, routing, addressing, and signaling information about or generated by the users. The users are never informed that the Website is collaborating with the Data Brokers to obtain the users' identifying information including telephone numbers.

66.    Each of the LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic DBSDKs is "reasonably likely" to identify the source of electronic impulses sent from devices visiting the Website. In fact, these DBSDKs are designed to meet this objective.

67.    Defendant did not obtain a court order before installing or using each of the LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic DBSDKs on its Website.

68.     Defendant did not obtain the express or implied consent of Plaintiff to be subjected to data sharing with LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic for the purposes of de-anonymization, profiling, and targeting.

69.     Defendant is statutorily ineligible to assert consent as a defense to its illegal use of a Trap and Trace device. Under Penal Code § 638.51(b), a consent defense is only available to a "provider of electronic or wire communication service," which Defendant is not.

70.     The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630 *et seq.*, imposes civil liability and provides for statutory damages for the installation and use of trap and trace software without a court order. *Id.* §§ 637.2, 638.51; *see Moody v. C2 Educ. Sys. Inc.*, No. 2:24-CV-04249-RGK-SK, 2024 WL 3561367 (C.D. Cal. July 25, 2024) (holding that data broker software was properly alleged to be a trap and trace device because it communicates over the internet and the statutory definition of a trap and trace device expressly covers "wire communication" and "electronic communication," and is not limited to telephone lines).

### CLASS ALLEGATIONS

71.     Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons within California whose identifying information was sent to California-registered Data Brokers as a result of visiting the Website within the limitations period.**

72.     NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

73.    COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

    a.    Whether the LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic DBSDKs are trap and trace processes as defined by California law;

    b.    Whether Plaintiff and Class Members are entitled to statutory damages;

    c.    Whether Class Members are entitled to injunctive relief; and

    d.    Whether Class Members are entitled to disgorgement of unlawfully obtained data.

74.    TYPICALITY: As a person who visited Defendant's Website and whose personal information was fingerprinted and de-anonymized by use of the LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic DBSDKs, Plaintiff is asserting claims that are typical of the Class.

75.    ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

76.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient.  Even if every Class Member could afford individual litigation, the court system could

17

not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

<u>**FIRST CAUSE OF ACTION**</u>

**Violations of California Trap and Trace Law**

**Cal. Penal Code § 638.51 (the "California Trap and Trace Law")**

77.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

78.    The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

79.    A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

80.    Each of the LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic DBSDKs, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).  Each of the LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic DBSDKs is designed to identify the source of the electronic and wire communications sent from the devices of users in California visiting the Website in violation of the California Trap and Trace Law.

81.    Defendant did not obtain a court order before using or installing each of the LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic DBSDKs on the Website.  Defendant also did not obtain consent from Plaintiff or any of the Class Members before

using trap and trace technology, including the LiveRamp, Outbrain, Comscore, Quantcast, MediaMath, Nielsen and PubMatic DBSDKs, to identify visitors to its Website.

82.     CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also C2 Educ. Sys. Inc.*, 2024 WL 3561367.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1.     An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

2.     An order that data unlawfully obtained by Defendant's deployment of a trap and trace device be disgorged;

3.     An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

4.     Statutory damages pursuant to CIPA;

5.     Reasonable attorneys' fees and costs; and

6.    All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: December 8, 2025                TAULER SMITH LLP


By:    */s/ J. Evan Shapiro*
         J. Evan Shapiro, Esq.

J. Evan Shapiro
Robert Tauler
90 Broad St., Suite 703
New York, New York 10004
eshapiro@taulersmith.com
rtauler@taulersmith.com
(212) 702-8670 (New York office)
(213) 927-9270 (Main Office (L.A.))

*Attorneys for Plaintiff Mariela Barajas*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.


DATED: December 8, 2025                TAULER SMITH LLP


                                      By:    */s/ J. Evan Shapiro*
                                             J. Evan Shapiro

                                      J. Evan Shapiro
                                      Robert Tauler
                                      90 Broad St., Suite 703
                                      New York, New York 10004
                                      eshapiro@taulersmith.com
                                      rtauler@taulersmith.com
                                      (212) 702-8670 (New York office)
                                      (213) 927-9270 (Main Office (L.A.))

                                      *Attorneys for Plaintiff Mariela Barajas*